# HOBBS, Assignee, v. McLEAN & Another.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF IOWA

Argued March 17, 18, 1886.—Decided March 29, 1886.

Where three persons form a partnership, and agree to bear the losses and share the profits of the partnership venture in proportion to their contribution to its capital, and two of the partners furnish all the money and do all the work, they are entitled to be repaid their advances out of its assets, before payment of the individual creditors of the partner who paid nothing and did nothing to promote the partnership business.

When a contract is open to two constructions, the one lawful and the other unlawful, the former must be adopted.

When many persons have a common interest in a trust fund, and one, for the benefit of all, at his own cost and expense, brings suit for its preservation or administration, a court of equity will order that the plaintiff be reimbursed his outlay from the property of the trust, or by proportional contribution from those who accept the benefit of his efforts.

When one brings adversary proceedings to take trust property from the possession of those entitled to it, in order that he may distribute it to those entitled adversely, and fails in his purpose, he cannot demand reimbursement of his expenses from the trust fund, or contribution from those whose property he has sought to misappropriate.

A, having contracted with the United States to furnish supplies of wood and hay to troops in Montana, entered into partnership with B and C for the purpose of executing the contract. A was to furnish half the capital, B and C one-fourth each, and profits and losses were to be divided on that basis: but in fact the capital was furnished by B and C. A delivered the wood according to the contract, but failed to deliver the hay, and, payment being refused, he brought suit in his own name in the Court of Claims against the United States to recover the contract price of the wood. In this suit B and C, each was a witness on behalf of A, and each testified that he had " no interest direct or indirect in the claim," except as a creditor of A, holding his note. Pending the suit A became bankrupt, and then died. His administratrix was admitted to prosecute the suit, but before entry of final judgment his assignee in bankruptcy was substituted in her place. Final judgment was then rendered in favor of the assignee, and the amount of the judgment was paid to him. B and C as surviving partners then filed a bill in equity against the assignee and the attorneys and counsel, to recover their shares in the partnership property. *Held:*

(1) That the interests of B and C in the partnership property were not affected by the fact that the contract under which they claimed was not made and

attested by witnesses after the issue of a warrant for payment, as required by Rev. Stat. § 3477.

(2) That they were not affected by the provisions of Rev. Stat. § 3737 that a transfer of a contract with the United States shall cause an annulment of the contract so far as the United States are concerned.

(3) That the cause of action to recover of the assignee their proportionate shares of the partnership fund in his hands accrued to B and C on the receipt of the money by the assignee.

(4) That B and C were not subject in this suit to the disabilities as witnesses imposed by Rev. Stat. § 858 upon parties to suits by or against executors, administrators or guardians.

(5) That B and C were not estopped by their declarations in the Court of Claims as to their interest in the claim there in controversy, from setting up the interest in it which they seek to enforce in this suit.

(6) That the assignee was entitled to no allowance for compensation for services, expenses and attorney's fees, in recovering the fund in the Court of Claims from the United States.

The appellees were the plaintiffs in the Circuit Court. The record showed the following facts: On August 19, 1876, Major Card, a quarter-master in the army of the United States, advertised for bids for furnishing 6000 cords of wood and 800 tons of hay at the Tongue River Military Station, in Montana Territory. Campbell K. Peck, whose assignee in bankruptcy is the appellant, put in a bid, and, believing that the contract would be awarded to him, on August 19, 1876, entered into articles of copartnership with the plaintiffs, McLean and Harmon, for the purpose of carrying out the contract with the United States which he expected to make. These articles provided that Peck should furnish one-half the capital necessary to carry on the partnership business, and McLean and Harmon each one-fourth, and that the profits and losses of the partnership should be divided in like proportions. Harmon agreed to take charge of the office of this partnership, which was to be at Fort Lincoln, and superintend the business at that place, and McLean agreed to go to the place of delivery on the Yellowstone and superintend the business there, but neither was to make any charges for his services. The articles of partnership further provided, that, when the contract with the government was completed, a settlement of profits and losses should be made " on the basis of the above terms of

partnership," and, " if a dissolution is decided on, first all debts shall be paid, and then all profits divided in the proportions heretofore mentioned." After the signing of these partnership articles the bid of Peck was accepted, and on August 25, the contract between him and the United States was signed and delivered.

The partners did not deliver the hay required by the contract, because, as they claimed, they were prevented from so doing by the officers of the army of the United States, but did cut and deliver the wood. McLean and Harmon did all the work that was done, and advanced all the money that was expended in performing the contract, except about $100, which was furnished by Peck.

The wood delivered under the contract amounted in value at the contract price to $51,900, but the United States refused to pay that sum, claiming damages for the failure to deliver the hay, but consented to pay, and did pay, $10,919.37. McLean and Harmon received $10,000 of this sum, and Peck $919.37, which was over $800 more than he advanced for the performance of the contract. The parties interested being dissatisfied with the action of the government in refusing payment in full for the wood delivered, Peck, who was the only person to whom the government was bound, filed, on November 7, 1877, his petition in the Court of Claims against the United States, demanding $55,003.63 damages for the breach of the contract. The United States traversed the petition, and, upon final hearing in the Court of Claims, judgment was rendered for Peck, the claimant, for $43,113.63. From this judgment both parties appealed to this court, which, in February, 1880, affirmed the judgment of the Court of Claims and allowed the claimant, in addition to the amount already awarded him, the further sum of $2660, making the entire judgment in favor of the claimant $45,773.63.

While the case was pending in the Court of Claims, to wit, on August 31, 1878, Peck was, on his own petition, adjudicated a bankrupt in the District Court of the United States for the District of Iowa, and Hobbs, the appellant in the present case, was appointed assignee. While the case was pending in this

court Peck, on December 2, 1879, died, and his widow, Helen
A. Peck, was afterwards appointed his administratrix, and in
January, 1880, was substituted in the place of her intestate as
the plaintiff in the cause. The case still being in this court,
and after Mrs. Peck had, as administratrix, been made party
plaintiff, Hobbs, as assignee, moved the court to be substituted
as plaintiff in her stead, which motion was denied. The cause
having been remanded to the Court of Claims, Hobbs, the as-
signee in bankruptcy, moved that court to substitute him as
plaintiff in place of 'the administratrix, which motion was, on
May 10, 1880, granted, and the money recovered from the
United States was, after deducting about $10,000 attorneys'
fees, paid over to Hobbs, the assignee.

McLean and Harmon, fearing that Hobbs would distribute
the fund thus recovered among the general creditors of Peck,
and believing that the fund belonged to them, filed in the Cir-
cuit Court for the Southern District of Iowa the bill in the
present case, to which they made Hobbs, as assignee in bank-
ruptcy of Peck, and John B. Sanborn and Charles King, lately
partners as Sanborn & King, and Edward F. Brownell defend-
ants, and in which they set out in detail the facts above
recited, set up their claim to the fund as surviving partners,
and prayed that the balance found due them from the partner-
ship on an accounting might be paid them out of the fund, so
far as it should be sufficient to pay the same.

The defendant Hobbs, as assignee, answered the bill, and the
plaintiffs filed the general replication. Upon final hearing
upon pleadings and proofs the Circuit Court adjudged and
decreed as follows: After reciting the making of the partner-
ship between the plaintiffs and Peck, and the performance by
the partnership of the contract made by Peck with the United
States, it found that, after charging to the partners all the
moneys received by them respectively, it appeared that Peck
had received more money than he had paid out in performing
the contract, and that the plaintiffs had expended for the same
purpose $41,032.31 more than they had received; that Hobbs,
the assignee, had collected and received on the judgment
against the United States recovered by Peck's administratrix

$35,773.63; and it was, therefore, adjudged and decreed that said sum was the money and property of the plaintiffs and that they recover it of the defendant Hobbs, who was ordered to pay it to the plaintiffs, with interest on the investment thereof, and that the plaintiffs also recover of Hobbs, as assignee, their costs and disbursements in the suit, to be paid by him out of any money in his hands as assignee. The appeal of Hobbs, as assignee, brought this decree under review.

*Mr. James Hagerman* for appellant. *Mr. Frank Hagerman* and *Mr. John H. Craig* were with him on the brief.

I. Peck's claim passed to assignee under the assignment in bankruptcy, and assignee was properly substituted in Peck's case in Court of Claims. Rev. Stat. §§ 5044, 5045, 5046, 5047. *Herndon* v. *Howard*, 9 Wall. 664; *Knox* v. *Exchange Bank*, 12 Wall. 379; *Person's Case*, 8 C. Cl. 543; *Erwin* v. *United States*, 97 U. S. 392; *Phelps* v. *McDonald*, 99 U. S. 298; *Peck's Case*, 14 C. Cl. 84.

II. The United States Circuit Court had no jurisdiction of this case, unless the complainants have an interest in the fund. Rev. Stat. § 4947.

III. On complainant's theory, the administratrix of Peck is a necessary party to this suit. *McKaig* v. *Hebb*, 42 Maryland, 227.

IV. The partnership agreement and powers of attorney and Peck's notes can be construed not to pass any interest, legal or equitable, in Peck's contract and claim. *Wright* v. *Ellison*, 1 Wall. 16; *Trist* v. *Child*, 21 Wall. 441.

V. The alleged partnership agreement and assignments are illegal, null, and void as to passing any interest in Peck's contract or claim as between assignor and assignee, and also as between United States and assignee. Rev. Stat. §§ 3477, 3737; *Trist* v. *Child*, 21 Wall. 441; *United States* v. *Gillis*, 95 U. S. 407; *Spofford* v. *Kirk*, 97 U. S. 484; *Wanless' Case*, 6 C. Cl. 123; *St. Paul Railroad Co.* v. *United States*, 112 U. S. 733; *Flint & Père Marquette Railroad Co.* v. *United States*, 112 U. S. 762; *Mellison* v. *Allen*, 30 Kansas, 382.

VI. The testimony of complainants in the Court of Claims

that they had no interest in Peck's contract was conclusive. *Mulligan* v. *Illinois Central Railroad Co.*, 36 Iowa, 181; *Marsh* v. *Mitchell*, 11 C. E. Green (26 N. J. Eq.), 497; *Edson* v. *Freret*, 11 La. Ann. 710. It operates as an estoppel. *Bronson* v. *Worth*, 7 Wall. 32; *Stowe* v. *United States*, 19 Wall. 13; *Bank of Pittsburg* v. *Neal*, 22 How. 96. And destroys their credibility. *The Santissima Trinidad*, 7 Wheat. 283.

VII. Complainants were incompetent witnesses under Rev. Stat. § 858. Assignees in bankruptcy are within the intent of this statute. *Crocker* v. *National Bank*, 4 Dillon, 358; *Tiffany* v. *Boatman's Institution*, 18 Wall. 375; *Tiffany* v. *Nat. Bank*, 18 Wall. 408; *Carpenter* v. *Rannels*, 19 Wall. 138; *United States* v. *Freeman*, 3 How. 556, 565.

VIII. Under the Iowa statute, complainants could not testify as to communications and transactions with Peck. Code of Iowa, 1873, § 3639; *Williams* v. *Brown*, 45 Iowa, 102; *Burton* v. *Baldwin*, 61 Iowa, 283; *First National Bank* v. *Owen*, 52 Iowa, 107; *Smith* v. *Johnson*, 45 Iowa, 308; *Van Sandt* v. *Cramer*, 60 Iowa, 424; *Conn. Life Ins. Co.* v. *Union Trust Co.*, 112 U. S. 250; *Lucas* v. *Brooks*, 18 Wall. 436; *Packet Co.* v. *Clough*, 20 Wall. 528.

IX. The judgment of the Court of Claims in Peck's suit, and the order substituting Hobbs, are *res judicatæ*. 1 Greenleaf on Ev. § 535; Bigelow on Estoppel, 3d ed. 59; *Stoddard* v. *Thompson*, 30 Iowa, 82; *Davis* v. *Milburn*, 4 Iowa, 246; *McNamee* v. *Moreland*, 26 Iowa, 96; *Chicago* v. *Robbins*, 2 Black, 418; *Cromwell* v. *Sac County*, 94 U. S. 351.

X. Complainant's right of action is barred by the statute of limitations. Rev. Stat. § 5057; *Ozeas* v. *Johnson*, 4. Dall. 434; *Bank* v. *Carrollton Railroad*, 11 Wall. 624; *Vinal* v. *West Virginia Oil Co.*, 110 U. S. 215; *Case* v. *Beauregard*, 99 U. S. 119; *Bailey* v. *Glover*, 21 Wall. 342.

XI. The assignee is entitled in any event to have compensation from the fund for services, expenses and attorneys' fees. *Trustees* v. *Greenough*, 105 U. S. 527; *Central Railroad* v. *Pettus*, 113 U. S. 116.

XII. The assignee is entitled to recover on his cross bill.

XIII. Complainants have no standing in a court of equity.

*Meguire* v. *Corwine*, 101 U. S. 108; 1 Wharton on Contracts, § 340; *Irwin* v. *Williar*, 110 U. S. 499.

Mr. *Charles E. Flandrau* and Mr. *Walter H. Sanborn* for appellees.

Mr. JUSTICE WOODS, after stating the case as reported above, delivered the opinion of the court.

The findings of fact made by the Circuit Court in its final decree are, in our opinion, amply sustained by the evidence. These findings, and other facts not disputed, establish *prima facie* the justice and equity of the decree.

Upon the facts of the case, the decree of the court is simply to this effect, that, where three persons form a partnership, and agree to bear the losses and share the profits of the partnership venture in proportion to their contributions to its capital, and two of the partners furnish all the money and do all the work, they are entitled to be repaid their advances out of its assets before payment of the individual creditors of the partner who paid nothing and did nothing to promote the partnership business. The decree may stand on even stronger grounds. There is no evidence in the record to show that there were any unpaid debts outstanding against the partnership of which Peck and the plaintiffs were the members. The decree of the court is based on the assumption that there were no such debts. The money, therefore, collected on the judgment recovered by Peck's administratrix was assets of the partnership, to which the partners were entitled in proportion to the amount paid in by them, and the record clearly shows that the money so collected was the only assets of the partnership. As McLean and Harmon had paid in all the money, they were entitled to all the money collected on the judgment, not by reason of any right to priority of payment, nor by reason of any lien, but because it was their property, and no other person had any claim to it. The plaintiffs' right to the fund was not at all impaired by the bankruptcy or death of Peck. Their claim was just as strong as if Peck were still living, and had received and collected the judgment in his own name, and the money had been taken

from his hands and impounded in the registry of the court. The decree might, therefore, stand on the ground which it in fact asserts, that the money in controversy was the absolute property of the plaintiffs.

The defendant, however, assails the decree on several grounds, which we shall proceed to notice.

It was shown by the evidence that on July 20, 1877, Peck executed and delivered to Harmon a paper, of which the following is a copy:

"FORT ABRAHAM LINCOLN, *July* 20, 1877.

"For value received, I promise to pay to William Harmon, or order, twenty-three thousand dollars, out of moneys I may hereafter receive on account of my claim against the United States Government, for contract for wood, at Tongue River cantonment, on the Yellowstone River.

"C. K. PECK."

On the same day he executed and delivered to McLean a paper, similar in terms, for the payment to him of $17,000 out of the same fund. The appellant insists that the contract of partnership between Peck and the plaintiffs, and the promises of Peck above mentioned, were forbidden by the statutes of the United States, and were, therefore, illegal and void, and gave no rights to the plaintiffs to the fund in controversy. The statutes relied on are §§ 3477 and 3737 of the Revised Statutes, which read as follows:

"SEC. 3477. All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. . . ."

"SEC. 3737. No contract or order, or any interest therein, shall be transferred by the party to whom such contract or

order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States."

We shall first consider these two sections in their bearing upon the contract of partnership between Peck and the plaintiffs. It is obvious that § 3477, which forbids assignments of claims against the United States or any interest therein, unless under the circumstances therein stated, can have no reference to such a contract as the partnership articles between Peck and the plaintiffs. When those articles were signed there was no claim against the United States to be transferred. Peck had at that time no contract even with the United States, and there was no certainty that he would have one. What is a claim against the United States is well understood. It is a right to demand money from the United States. Peck acquired no claim in any sense until after he had made and performed, wholly or in part, his contract with the United States. Section 3477, it is clear, only refers to claims against the United States which can be presented by the claimant to some department or officer of the United States for payment, or may be prosecuted in the Court of Claims. The section simply forbids the assignment of such claims before their allowance, the ascertainment of the amount due thereon, and the issue of a warrant for their payment. When the contract of partnership was made Peck had no claim which he could present for payment or on which he could have brought suit. He, therefore, had no claim the assignment of which the statute forbids. It is so clear that the articles of partnership do not constitute such an assignment as is forbidden by the section under consideration, that it would be a waste of words further to discuss the point.

Nor are the articles of partnership forbidden by § 3737. They do not transfer the contract or any interest therein to the plaintiffs, and cannot fairly be construed to do so. But if the articles of partnership were fairly open to two constructions, the presumption is that they were made in subordination

to and not in violation of § 3737; and if they can be construed consistently with the prohibitions of the section they should be so construed. For it is a rule of interpretation that, where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted. Whart. on Ev., 2d ed.; §. 1250; Best's Evidence, 6 Eng. Ed., 1st Am. Ed., §§ 346, 347; *Shore* v. *Wilson*, 9 Cl. & F. 355, 397; *Moss* v. *Bainbrigge*, 18 Beav. 478; *Lorillard* v. *Clyde*, 86 N. Y. 384; *Mandal* v. *Mandal*, 28 La. Ann. 556. Interpreting the articles in the light of the statute, as it is the duty of the court to do, they were not intended to transfer, and do not transfer, to the plaintiffs any claim or demand, legal or equitable, against the United States, or any right to exact payment from the government by suit or otherwise. They may be fairly construed to be the personal contract of Peck, by which, in consideration of money to be advanced and services to be performed by the plaintiffs, he agreed to divide with them a fund which he expected to receive from the United States, on a contract which he had not yet entered into. This is the plainly expressed meaning of the partnership contract, and it is only by a strained and forced construction that it can be held to effect a transfer of Peck's contract with the United States and to be a violation of the statute.

We are of opinion that the partnership contract was not opposed to the policy of the statute. The sections under consideration were passed for the protection of the government. *Goodman* v. *Niblack*, 102 U. S. 556. They were passed in order that the government might not be harassed by multiplying the number of persons with whom it had to deal, and might always know with whom it was dealing until the contract was completed and a settlement made. Their purpose was not to dictate to the contractor what he should do with the money received on his contract after the contract had been performed.

One or both of the sections of the statute which we are now considering have been under the review of this court in the following cases: *United States* v. *Gillis*, 95 U. S. 407; *Erwin* v. *United States*, 97 U. S. 392; *Spofford* v. *Kirk*, 97 U. S. 484;

*Goodman* v. *Niblack,* 102 U. S. 556; *Bailey* v. *United States,* 109 U. S. 432; *St. Paul and Duluth Railroad Co.* v. *United States,* 112 U. S. 733. In none of them is any opinion expressed in conflict with the views we have announced in this case.

Our conclusion, therefore, is, that the articles of partnership were not forbidden by the letter or policy of this statute.

In respect to the papers executed by Peck on July 20, 1877, by which he agreed to pay $23,000 to Harmon and $17,000 to McLean, respectively, "out of moneys" he might "thereafter receive on account of" his "claim against the United States Government for contract for wood," &c., it is plain they confer no new rights on the plaintiffs, and take away no old ones. The evidence shows that Harmon and McLean were entitled, under the partnership articles, to the money specified in these memoranda. Peck was, therefore, only promising to do what, on a good consideration, he had already by the articles of partnership promised to do. There was no new consideration for these new promises. The only office, therefore, which the memoranda performed was to show the amount then due the plaintiffs, respectively, under the articles of partnership. It would be a strange conclusion to hold that, by accepting these papers, the plaintiffs lost their right, which they had already acquired under the articles of partnership, to have the money therein mentioned paid over to them when it should be collected by Peck, their copartner. If the obligation assumed by Peck in his articles of partnership was valid and binding, it was not impaired or annulled by the giving and the acceptance of these memoranda. From what we have already said in discussing the articles of partnership, it is clear that they were not forbidden by the language or policy of the sections prohibiting the transfer of claims and contracts.

It is next assigned for error that the Circuit Court did not give effect to the defence of the statute of limitation of two years, prescribed by section 5057 of the Revised Statutes, which was set up in the answer of the defendant.

The section mentioned forms a part of § 2 of the bankrupt act of March 2, 1867, ch. 176, 14 Stat. 517, and provides that

no suit at law or in equity shall be maintained in any court between an assignee in bankruptcy and a person claiming an adverse interest, touching any property, or rights of property, transferable to or vested in such assignee, unless brought within two years from the time when the cause of action accrued for or against such assignee.

It is plain that the facts shown by the record do not sustain this defence. This suit is for the recovery, as assets of a partnership, of the money collected on the contract between Peck and the United States, and its distribution among the partners on a settlement of the partnership affairs. If Peck had lived and had not been adjudicated bankrupt, the plaintiffs could not have maintained this suit against him until the money which is the subject of this controversy had been collected from the United States. They had no right under this contract with Peck to demand their share of the money until the money had come to his hands. The bankruptcy and death of Peck did not change the terms of the contract. They could not sue his assignee for a distribution of the fund until the fund had been received. The judgment against the United States in favor of Peck's administratrix was not affirmed by this court until February 10, 1880, and the money was not received by the defendant until after he had been substituted as claimant in the case in place of Helen A. Peck, administratrix, by order of the Court of Claims, on May 10, 1880. This suit was begun September 22, 1880.

A bill like the present, for the settlement of the affairs of the partnership and the distribution of its assets among the partners, would have been premature until the final determination of the suit of Peck against the United States, for that suit involved all the assets of the partnership, and until it was decided there could be no adjustment of the partnership concerns and no distribution of its assets; in fact, it was uncertain whether there would be any assets to distribute. As, therefore, the plaintiffs were not entitled to the relief prayed in the bill until final judgment in the suit of Peck against the United States, and especially had no demand against the defendant until the fund, which they assert was assets of the partnership, came to

his hands, it is plain that the statute of limitation was not well pleaded.

It is next assigned for error that the Circuit Court admitted the testimony of McLean and Harmon, the plaintiffs, offered in their own behalf, in regard to transactions with and statements by Peck, he being dead, and the suit being against his assignee in bankruptcy. It is insisted that the testimony of these witnesses was incompetent under section 858 of the Revised Statutes, which provides as follows: " In the courts of the United States no witness shall be excluded  .  .  .  in any action because he is a party to or interested in the issue tried: *Provided*, that, in actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with, or statement by, testator, intestate, or ward, unless called to testify thereto by the opposite party, or required to testify thereto by the court. In all other respects the laws of the State in which the court is held shall be the rules of decision as to the competency of the witnesses in the courts of the United States, in trials at common law, and in equity and admiralty."

The witnesses admitted by the Circuit Court were not excluded by the terms of this statute. The suit in which they testified was not an action by or against an executor, administrator, or guardian. But the counsel for the defendant insists that the policy of the act applies to suits by or against assignees as well as to suits by or against executors, administrators, or guardians, and that we ought to construe the act so as to include such suits. We cannot concur in this view. The purpose of the act was to remove generally the old incapacity to testify imposed on parties or persons interested in the suit. This was done by a sweeping provision, subject to certain well-defined exceptions, but the exceptions did not include suits by or against assignees in bankruptcy. We cannot insert the exception. When a provision is left out of a statute, either by design or mistake of the legislature, the courts have no power to supply it. To do so would be to legislate and not to construe. " We are bound," says Mr. Justice Buller, in *Jones* v. *Smart*, 1 T. R.

44, "to take the act of Parliament as they have made it;" and Mr. Justice Story, in *Smith* v. *Rines*, 2 Sumner, 338, 354, 355, observes, "It is not for courts of justice *proprio marte* to provide for all the defects or mischiefs of imperfect legislation." See also *King* v. *Burrell*, 12 A. & E. 460; *Lamond* v. *Eiffe*, 3 Q. B. 910; *Bloxam* v. *Elsee*, 6 B. & C. 169; *Bartlett* v. *Morris*, 9 Port. (Ala.) 266. The objection made to the admission of the testimony of the plaintiffs was properly overruled.

The next ground of complaint against the decree of the Circuit Court is, that the court did not hold the plaintiffs estopped from asserting title to the fund in controversy, by the fact that they each testified in the suit of Peck against the United States, in which the fund was recovered, that he had no interest, direct or indirect, in the claim of Peck, except that he held one of the notes or memoranda made by Peck, a copy of one of which has already been given.

It must be conceded that this testimony was evasive and disingenuous, but it was not false. But admitting that the testimony was untrue, it is difficult to see how any estoppel is raised which the defendant can set up against a recovery in this case by the plaintiffs. An equitable estoppel is raised when there is some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud, by which another has been misled to his injury. *Brant* v. *Virginia Coal & Iron Co.*, 93 U. S. 326. If any estoppel could be set up in this case by reason of the testimony of the plaintiffs, it would be one in favor of the United States, who alone could have been injured by that testimony.

It is clear that the estoppel could not be set up by the defendant, for the evidence was given on his side of the controversy, and he is now in possession of and claims the fund which that testimony aided Peck, whose assignee he is, to recover. There was, therefore, no injury to the defendant and no estoppel which he could set up against these plaintiffs. See *Cushing* v. *Laird*, 107 U. S. 69.

It is true, his counsel say, that, by reason of the denial by the plaintiffs that they had any interest in Peck's claim, the defend-

ant was induced to employ counsel and move both this court and the Court of Claims, that he be made, as assignee of Peck, the party plaintiff in the suit against the United States, and to expend a large sum of money in prosecuting his motions. As we have already found that the plaintiffs were entitled to the fund in controversy, and the defendant was not, this contention amounts to this, that the plaintiffs should be precluded from a recovery of their own property, and it ought to be turned over to the defendant, because the defendant, misled by the testimony of the plaintiffs given in a case to which he was not at the time either a party or privy, was induced to expend money in a proceeding to get possession of the subject-matter of the controversy, to which, as it turned out, he had no title whatever. Upon such a state of facts no estoppel is raised. But there is no proof in the record that the defendant was misled by the testimony of the plaintiffs, or that he did not know the exact truth when he took the proceedings referred to. In no point of view, therefore, can the defendant assert that the plaintiffs are estopped to claim the fund in controversy.

Lastly, the defendant insists that the Circuit Court erred in not allowing him compensation for his services, expenses, and attorneys' fees in recovering the fund in the Court of Claims from the United States. In reply to this contention, it is sufficient to say that the defendant rendered no services whatever in the recovery of the fund. Judgment had been rendered in the Court of Claims in favor of the administratrix of Peck, and had been affirmed by this court, and the mandate of this court had been sent to the Court of Claims, before the defendant was admitted as plaintiff in the suit for the recovery of the fund. All he did was to get the fund into his possession. As in our view the fund belongs to the plaintiffs in this suit, all that comes out of it for the compensation of the defendant comes out of their pockets. We see no reason why they should pay the defendant, who, instead of aiding them in securing their rights, has been an obstacle and obstruction to their enforcement. The services for which the defendant seeks pay from the plaintiffs were not rendered in their behalf, but in hostility to their interest.

When many persons have a common interest in a trust property or fund, and one of them, for the benefit of all and at his own cost and expense, brings a suit for its preservation or administration, the court of equity in which the suit is brought will order that the plaintiff be reimbursed his outlay from the property of the trust, or by proportional contribution from those who accept the benefits of his efforts. See *Trustees v. Greenough*, 105 U. S. 527, where the subject is discussed by Mr. Justice Bradley, and the cases cited; and *Central Railroad Co. v. Pettus*, 113 U. S. 116. But where one brings adversary proceedings to take the possession of trust property from those entitled to it, in order that he may distribute it to those who claim adversely, and fails in his purpose, it has never been held, in any case brought to our notice, that such person had any right to demand reimbursement of his expenses out of the trust fund, or contribution from those whose property he sought to misappropriate.

The Circuit Court was right in not compelling the plaintiffs to pay for services rendered and expenses incurred in a proceeding adversary to their interest, and carried on for the benefit of others.

There is no error in the record.          *Decree affirmed.*